**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X
AARON CHASE,

                    Plaintiff,

              v.

REED SMITH LLP, JENNIFER ACHILLES and
MICHAEL LOWELL, in their individual and
professional capacities,

                    Defendants.
---------------------------------------------------------------- X

Civil Action No.:

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Aaron Chase ("Mr. Chase"), by and through his counsel Wigdor LLP, hereby alleges against Defendants Reed Smith LLP ("Reed Smith" or the "Firm") Jennifer Achilles ("Achilles"), and Michael Lowell ("Lowell"), as follows:

**PRELIMINARY STATEMENT**

1. Aaron Chase is an experienced attorney, a litigator, whose profession demands that he advance his clients' interests and zealously represent them in adversarial proceedings. Litigators are not rewarded professionally for being silent in the face of injustice or letting others take advantage of them. Unfortunately, Mr. Chase is now in the position where he must stand up against injustice and unlawful conduct committed against himself, rather than one of his clients.

2. On October 6, 2017, Mr. Chase began his tenure at Reed Smith as a senior associate in the White-Collar practice group. Barely over a year later, on December 14, 2018, in recognition of his work, Mr. Chase was promoted to counsel which took effect in January 2019.

3. On September 12, 2019, while on vacation, Mr. Chase accidentally hit his head hard on the frame of a vehicle while getting into a car. As a result, Mr. Chase suffered a concussion. Despite this, on September 23, 2019, Mr. Chase returned to work.

4. After his return to work, Mr. Chase disclosed his injury to his supervisor, partner Jennifer Achilles. Mr. Chase was forthcoming about his injury and told Ms. Achilles about his symptoms and how concussions, unlike purely physical injuries, can make the afflicted person feel disconnected from his sense of self and impair one's thinking.

5. While Mr. Chase believed this conversation would lead Ms. Achilles to better understand his work limitations, it instead led to a discriminatory chain of perceptions and events that resulted in Mr. Chase's termination.

6. On or around October 9, 2019, Mr. Chase was called into a meeting with Ms. Achilles to discuss an error made on one of Mr. Chase's cases. Ms. Achilles also took the opportunity to criticize Mr. Chase for other supposed past "performance issues," some of which had never been brought to his attention previously and/or which had not been raised as problems with his performance.

7. When Ms. Achilles raised the error, Mr. Chase said, "I don't think this would have happened if I wasn't suffering from a concussion." Ms. Achilles responded, "It's unfortunate that the thing that broke the camel's back happened while you are suffering from a concussion, but you did basically the same thing a few months ago, so I don't think it was the result of the concussion."

8. It was clear to Mr. Chase that, with this discussion happening so quickly on the heels of the emotional disclosure of his injury and disability to Ms. Achilles, that the disclosure of his disability and the performance criticism were connected. Within days of when Mr. Chase had explained the seriousness of his concussion to Ms. Achilles, Ms. Achilles told Mr. Chase that she no longer wanted to work with him.

9. After more than a month of attempting to push through the pain and difficulties of his injury, on October 24, 2019, Mr. Chase became unable to remain in the office due to the severity of his concussion symptoms and started his medical leave.

10. On February 27, 2020, Mr. Chase returned to work from his medical leave. Shortly after his return, Ms. Achilles informed Mr. Chase that she did not have anything that he could work on because her matters were fully staffed by other employees, including an associate, a less-experienced attorney, who was hired during Mr. Chase's leave and staffed on all of the cases on which Mr. Chase was previously working.

11. After Mr. Chase returned from leave, he reached out to a number of partners across a variety of practice groups requesting billable work. Very few assignments came to fruition.

12. On May 8, 2020, Mr. Chase was terminated, with the Firm citing the "performance issues" that Ms. Achilles had discussed with Mr. Chase in October 2019, roughly **six months earlier**, which had not come up since.

13. The termination damaged Mr. Chase's professional career and reputation and came barely two months after he had returned from his legally protected Family Medical Leave Act leave.

14. Defendants' actions constitute unlawful retaliation under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, as well as unlawful interference under the FMLA, 29 U.S.C. § 2615(a)(1). Plaintiff seeks all available declaratory, injunctive and monetary relief.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

16. Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

17. Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Following the EEOC's issuance of a Notice of Right to Sue, Mr. Chase will seek leave of the Court to further amend the Complaint to add claims under the Americans with Disabilities Act ("ADA").

18. Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

19. Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

20. Plaintiff Aaron Chase is a former employee of Reed Smith. Plaintiff currently resides in Brooklyn, NY and was employed in the Reed Smith office located at 599 Lexington Avenue, New York, NY 10022. At all relevant times, Plaintiff met the definition of "employee" and/or "eligible employee" under all applicable statutes.

21. Defendant Reed Smith LLP is a foreign registered limited liability partnership

with registration in Delaware and with its principal place of business located at 599 Lexington Avenue, New York, NY 10022.  At all relevant times, Reed Smith met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

22.     Defendant Jennifer Achilles is a Partner at Reed Smith and directly supervised Plaintiff at the time of his termination and directly participated in the unlawful and retaliatory conduct to which Plaintiff was subjected.  At all relevant times, Ms. Achilles met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

23.     Defendant Michael Lowell is a Partner at Reed Smith and supervised Plaintiff at the time of his termination and directly participated in the unlawful and retaliatory conduct to which Plaintiff was subjected.  At all relevant times, Mr. Lowell met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.     Mr. Chase's Professional Background**

24.     Mr. Chase is an accomplished attorney with almost 15 years of legal experience. Mr. Chase earned a Bachelor of Engineering from McGill University in Montreal, Canada, and also went on to earn his joint Bachelor of Laws and Bachelor of Civil Laws from McGill, where he was ranked amongst the top fifteen percent of his class, graduating with "Great Distinction."

25.     Mr. Chase began his legal career as a litigator at White & Case LLP, where he remained for nine years.  While at White & Case LLP, Mr. Chase developed a reputation in the legal community as a skilled litigator.  Mr. Chase defended high-profile clients such as Google and Verizon Wireless in various cases.

26.     Mr. Chase also served as an Assistant Attorney General in the Bureau of Internet and Technology (the "Bureau") in the Office of the New York State Attorney General (the

"Office") for three years. During his time as an Assistant Attorney General, Mr. Chase investigated and litigated cases concerning all manner of fraud, illegal acts and consumer-adverse activity.

27. Mr. Chase played an integral role in investigating and litigating against two of the largest daily fantasy sports betting operators, leading to settlements totaling $12 million. He also played a key role in the Office's investigation of and litigation against Charter Communications, Inc. for consumer protection violations, which led to a $174 million settlement in December 2016. In recognition of his outstanding work for the Bureau, Mr. Chase was awarded the Louis J. Lefkowitz Award in January 2017, the highest commendation bestowed by the New York Attorney General's office on attorneys.

28. On October 6, 2017, Mr. Chase began his tenure at Reed Smith as a senior associate in the White-Collar practice group, and looked forward to a long career at the Firm. Already a seasoned litigator, Mr. Chase's responsibilities included advising several large financial institutions and operating companies in matters before both federal and state agencies and courts.

29. On December 14, 2018, in recognition of his work, Mr. Chase was promoted to counsel. When Reed Smith announced Mr. Chase's promotion, Casey Ryan ("Ms. Ryan"), the Global Head of Legal Personnel, marked the occasion by stating that, "These promotions result from [each attorney's] outstanding legal skills and client service, their high level of productivity, and their strong Firm citizenship. They have each made valuable contributions to the success of our business, and we are confident they will continue to do so."

## II.     Mr. Chase Suffers a Concussion and Faces Animus

30.     On September 12, 2019, while on vacation, Mr. Chase accidentally hit his head hard on the frame of a vehicle while getting into a car.  As a result, Mr. Chase suffered from a concussion.  Despite this, on September 23, 2019, Mr. Chase returned to work.

31.     In or around late September/early October 2019, Mr. Chase spoke with Jennifer Achilles ("Ms. Achilles"), a partner and Mr. Chase's direct supervisor, in her office about his concussion.

32.     Mr. Chase was forthcoming about his injury and told Ms. Achilles about his symptoms, including how concussions, unlike purely physical injuries, can make the afflicted person feel disconnected from his sense of self and impair one's thinking.  During this conversation, Mr. Chase got very emotional and left Ms. Achilles's office hurriedly because he was on the verge of tears.  This display of emotions was uncharacteristic for Mr. Chase, who rarely discussed personal issues with Ms. Achilles, or anyone else at his workplace.

33.     On or around September 30, 2019, the United States Attorney's Office for the Southern District of New York ("U.S. Attorney's Office") requested additional documents from a client of Ms. Achilles and Mr. Chase pursuant to a subpoena issued to the client months earlier.  The U.S. Attorney's Office sought documents from new custodians regarding a transaction between the client and another company.

34.     The process of responding to the subpoena included reviewing documents and emails and then producing them to the government.  Mr. Chase was put in charge of that process.

35.     In early October 2019, Ms. Achilles responded to the U.S. Attorney's Office that they would start working on the response to the additional requests for documents.  During lunch on or around that day at Barilla, a restaurant in midtown Manhattan, after a meeting at Paul

Weiss, Mr. Chase and Ms. Achilles talked at length about the symptoms Mr. Chase was experiencing as a result of his concussion.

36. During the preparation of this document production, Mr. Chase discussed an email with Ms. Achilles that was unfavorable to the client. Ms. Achilles instructed Mr. Chase not to produce the document at that time, even though it was clearly responsive to the government subpoena and not subject to any privilege.

37. Although it was Mr. Chase's intention to exclude the document per Ms. Achilles's instruction, a miscommunication occurred with the Litigation Support Technician assigned to assist in the production.

38. During the preparation of the production, the technician had sent an email asking if Mr. Chase and Ms. Achilles wanted him to withhold documents from three specific custodians. Ms. Achilles responded affirmatively, and stated that she wanted those documents "held back." The unfavorable email was among the documents from one of those three custodians that Ms. Achilles instructed to "hold back," and therefore Mr. Chase believed that no further instructions were necessary in order to exclude that particular document.

39. Apparently, however, the technician believed that Ms. Achilles meant that he should only withhold the documents for those custodians related to one category or subset of documents. As a result, the production was given to the government with the unfavorable email included, when it would have been produced only later according to Ms. Achilles's intentions.

40. On October 9, 2019, Mr. Chase was called into a meeting with Ms. Achilles to discuss the production of the document. Ms. Achilles also took the opportunity to criticize Mr. Chase for other past supposed "performance issues," some of which had never been brought to his attention previously and/or which had not been raised as problems with his performance.

These proffered examples included the inadvertent production of a small number of innocuous emails in an earlier production in the same case discussed above.

41. When Ms. Achilles raised the inadvertent production of the unfavorable email, Mr. Chase said, "I don't think this would have happened if I wasn't suffering from a concussion."

42. Ms. Achilles responded, "It's unfortunate that the thing that broke the camel's back happened while you are suffering from a concussion, but you did basically the same thing a few months ago, so I don't think it was the result of the concussion."

43. It was clear to Mr. Chase that, with this discussion happening so quickly on the heels of the emotional disclosure of his injury and disability to Ms. Achilles, the disclosure of his disability and the new performance criticism were connected.  Within days of the lunch at Barilla at which Mr. Chase had explained the seriousness of his concussion to Ms. Achilles, Ms. Achilles told Mr. Chase that she no longer wanted to work with him.

44. In order to justify her new reluctance to work with Mr. Chase because of his condition, Ms. Achilles pointed to events that had happened months earlier that she had not raised as significant issues.  The more recent production that she had pointed to was the result of a miscommunication on the part of more than one person, including herself, and does not at all justify or explain the outsized response, particularly given Mr. Chase's excellent track record.  Mr. Chase is not aware of any adverse consequences resulting from the production of the document at that time rather than later.

45. Ms. Achilles appeared to be conveying to Mr. Chase that she was no longer willing to work with him.  Mr. Chase apologized for the mistake, but, sensing that his livelihood could be at risk, told Ms. Achilles that he would start looking for a job elsewhere.

46. Ms. Achilles assured Mr. Chase that "nobody needs to know" about their conversation that day, and that she would not object to him continuing to work at Reed Smith if he was able to find work with other partners.

47. Mr. Chase told Ms. Achilles that he enjoyed working with David Adelman ("Mr. Adelman"), another partner, and hoped to work with him more on a matter that Mr. Adelman, Ms. Achilles and Mr. Chase were already working on together.

48. For the rest of October 2019, Mr. Chase continued to work on ongoing matters with Ms. Achilles and received praise for his work from multiple partners, including Mr. Adelman.

49. During this time, Mr. Chase continued to experience symptoms of his concussion, including fogginess, trouble concentrating, headaches and sensitivity to light and sound. As a result of these symptoms, on or around October 22, 2019, Mr. Chase took a half-day in order to be evaluated by a neurologist and rest. Mr. Chase's neurologist recommended that Mr. Chase take time off from work, but Mr. Chase tried to fight through his symptoms to keep working.

50. When Mr. Chase went to work on October 23, 2019, he was still feeling extremely unwell, and was forced to take off another half-day. On October 24, 2019, Mr. Chase again tried to return to work but ultimately was unable to remain in the office due to the severity of his concussion symptoms. That day, Mr. Chase began his medical leave.

51. On or around December 5, 2019, while Mr. Chase was still out on medical leave, Mike Lowell ("Mr. Lowell"), co-Practice Group Leader for the Global Regulatory Enforcement Group, reached out to Mr. Chase in order to give him best wishes for his recovery.

52. Mr. Chase took that opportunity to ask Mr. Lowell to have a call in order to discuss his 2019 bonus. During this call, there was no mention of any performance issues.

53. On December 9, 2019, Reed Smith hired an associate to work in the Global Regulatory Enforcement Group with Ms. Achilles.

54. On February 27, 2020, Mr. Chase returned to work from his medical leave. Shortly after his return, Ms. Achilles informed Mr. Chase that she did not have anything that he could work on because her matters were fully staffed by the associate and other employees.

55. After multiple conversations with various partners, it became clear to Mr. Chase that it had become incredibly difficult for him to obtain work from the Firm after his medical leave.

56. In addition, no efforts were made to reintegrate Mr. Chase into the Firm upon his return, despite the Firm's purported policy of observing a "ramp-up" period in order to assist employees in reintegrating themselves in the Firm's practice after a leave of absence.

57. Reed Smith effectively replaced Mr. Chase during his medical leave with the aforementioned associate, a less-experienced attorney, who was staffed on all of the cases on which Mr. Chase was previously working.

58. In the coming weeks, Mr. Chase had multiple business conversations with multiple partners, including Ms. Achilles and Mr. Lowell. At no point did any of those individuals raise any concerns about Mr. Chase's work performance.

59. After Mr. Chase returned from leave, he reached out to a number of partners across a variety of practice groups requesting billable work. Very few assignments came to fruition.

60. On March 12, 2020, Reed Smith announced that the offices would be closing the next day, starting March 13, due to the COVID-19 pandemic, and that all lawyers were to begin working from home.

61. On March 17, 2020, Mr. Chase sent an email to Mr. Lowell asking how he could be helpful. This message was followed up with a phone call. During this call, Mr. Lowell did not mention any performance issues.

62. On March 19, 2020, Mr. Chase sought leads from Ms. Ryan, as to where he could find additional billable work. Ms. Ryan provided Mr. Chase with suggestions.

63. On March 20, 2020, Mr. Chase emailed Mr. Lowell to provide him with an update on his work progress. In the following weeks, Mr. Chase reached out to Mr. Lowell to provide further updates as to what he was working on and to offer assistance on any outstanding matters. At no point prior to Mr. Chase's termination did Mr. Lowell mention any concerns about Mr. Chase's performance.

64. On March 31, 2020, Mr. Chase reached out to Ms. Achilles asking if she knew where he could find work. In a subsequent phone call, Ms. Achilles provided advice as to where Mr. Chase might be able to find work.

65. Later that day, Mr. Chase received work from a partner in the Labor and Employment Group, to whom he had reached out. Mr. Chase continued to reach out to countless attorneys at the Firm to request billable work.

66. On May 4, 2020, Mr. Lowell sent Mr. Chase an email encouraging Mr. Chase to reach out to nine partners and to make sure they were aware of his "experience [and] abilities."

67. On May 8, 2020, Mr. Adelman emailed Mr. Chase and Ms. Achilles to let them know that a client they had all been working with may engage them for additional work. Ms. Achilles responded that she was hopeful that they would receive the work.

68. Despite his continued eagerness to work and commendable efforts to obtain work after his return from medical leave during the onset of a pandemic, Mr. Chase could not turn to

Ms. Achilles for work, and unfortunately was not given sufficient time to reestablish his workload, despite the Firm's purported commitment to its own "ramp-up" policy.

### III. Mr. Chase Is Unlawfully Terminated

69. On May 8, 2020, Mr. Chase received a call from Mr. Lowell and a Human Resources ("HR") representative. Mr. Lowell informed Mr. Chase that he was being terminated for the performance reasons that Ms. Achilles had discussed with Mr. Chase in October 2019, **six months earlier**, which nobody at the firm had brought up with him since.

70. Mr. Lowell made a point to tell Mr. Chase that his termination purportedly was not related to his recent medical leave, nor his productivity since returning from leave, nor the current economic situation or the COVID-19 pandemic.

71. Indeed, this termination discussion expressly shows that the Firm had considered and discussed Mr. Chase's disability and recent related leave in the course of its decision regarding whether or not to terminate him (as well as Mr. Chase's likely and reasonable conclusion that they were connected, which he articulated on the spot).

72. Further, no financially driven layoffs have been publicly reported at Reed Smith to date.

73. Additionally, Mr. Lowell expressly disclaimed any financially driven layoff as a factor in the decision.

74. Finally, despite the lack of layoffs at the Firm, Mr. Chase was not afforded the usual "ramp-up" period that employees are given after a leave pursuant to Firm policy, which he was expressly told would apply to him.

75. Combined with the sequence of events (Mr. Chase was terminated barely two months after his return from leave) and the close connection between Mr. Chase's disability and

13

the criticisms made by Ms. Achilles (which served as the Firm's proffered explanation for the termination), it is clear that the Firm terminated him based upon his disability and/or related medical leave.

76. That same day, Mr. Chase made a request to HR to receive a copy of his personnel file. Though he was promised that this would be provided to him, it was never done.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the FMLA)
*Against All Defendants*

77. Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

78. At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA. Plaintiff, a full-time employee of Reed Smith, at all relevant times worked at least 1,250 hours in any 12-month period, and specifically, in the 12-month period preceding his termination and leave.

79. At all times relevant herein, Reed Smith was a "covered employer" within the meaning of the FMLA. Reed Smith employs 50 or more employees in at least 20 calendar weeks within a 75 mile radius of the Firm's office where Mr. Chase worked.

80. By the actions described above, including by terminating Mr. Chase's employment, among others, Defendant Reed Smith has retaliated against Mr. Chase for taking FMLA leave.

81. As a direct and proximate result of Defendant Reed Smith's unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

## SECOND CAUSE OF ACTION
**(Unlawful Interference in Violation of the FMLA)**
*Against All Defendants*

82. Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

83. At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA, and Reed Smith was a "covered employer" within the meaning of the FMLA.

84. By the actions described above, among others, Defendants have unlawfully interfered with Mr. Chase's right to take FMLA leave by unlawfully terminating his employment barely two months after his return to work following FMLA leave.

85. As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

## THIRD CAUSE OF ACTION
**(Disability Discrimination in Violation of the NYSHRL)**
*Against All Defendants*

86. Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

87. By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of his actual and/or perceived disability in violation of the NYSHRL by subjecting him to disparate treatment based upon disability, including, but not limited to, subjecting him to unequal standards and conditions of employment and terminating his employment.

88. As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

89. As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

90. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is further entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Disability Discrimination in Violation of the NYCHRL)
*Against All Defendants*

91. Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

92. By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of his actual and/or perceived disability in violation of the NYCHRL by subjecting him to disparate treatment based upon his disability and terminating his employment.

93. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

94. As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

95.     Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, through the following relief:

A.     A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States, the State of New York and City of New York;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

E.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.     An award of punitive damages in an amount to be determined at trial;

    G.    An award of liquidated damages in an amount to be determined at trial;

    H.    An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

    I.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 5, 2020
       New York, New York                         Respectfully submitted,

                                                          **WIGDOR LLP**

                                                          By: _____
                                                               Lawrence M. Pearson
                                                                Lindsay M. Goldbrum

                                                          85 Fifth Avenue
                                                          New York, NY 10003
                                                          Telephone: (212) 257-6800
                                                          Facsimile: (212) 257-6845
                                                          lpearson@wigdorlaw.com
                                                          lgoldbrum@wigdorlaw.com

                                                          *Attorneys for Plaintiff*